IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2015

**BOBBY GLEN CROCKER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Carroll County**
**No. 05CR98PC      Donald E. Parish, Judge**

———————————————

**No. W2014-01082-CCA-R3-PC  -  Filed May 6, 2015**

———————————————

Petitioner, Bobby Glen Crocker, filed a petition for post-conviction relief, which was dismissed by the post-conviction court as being barred by the statute of limitations. He appeals the post-conviction court's finding that the statute of limitations should not be tolled due to Petitioner's mental incompetency. Following a careful review of the record, we affirm the decision of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Neil Thompson, Huntingdon, Tennessee, for the petitioner, Bobby Glen Crocker.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Hansel Jay McCadams, District Attorney General; and R. Adam Jowers, Assistant District Attorney General, for the respondent, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

Over ten and one-half years ago, the Petitioner murdered his wife. He pled guilty in the Circuit Court of Carroll County in 2006 and filed his first petition for post-conviction relief in 2011. The post-conviction court's dismissal of that petition was affirmed by this Court in 2013. *Bobby Glen Crocker v. State*, No. W2012-00960-CCA-R3-PC, 2013 WL 2327092 (Tenn. Crim. App. May 28, 2013), *perm. app. granted* (Tenn.

Oct. 23, 2013). The Tennessee Supreme Court vacated this Court's decision and remanded the case to the post-conviction court for an additional hearing. It is from that hearing and subsequent judgment of dismissal that the Petitioner now appeals.

The following excerpt comes from this Court's original opinion affirming the dismissal of Petitioner's first petition for post-conviction relief:

> The Carroll County Grand Jury indicted the Petitioner for first degree premeditated murder for the October 2004 killing of his estranged wife. In November 2004, Pathways Behavioral Health conducted a competency evaluation and concluded that, based on the Petitioner's mental retardation, he was incapable of defending himself at trial. In February 2005, Western Mental Health Institute assessed the Petitioner and found him to be "functioning within the [m]oderate range of mental retardation." The State filed a motion requesting that, based on the "mixed messages" of the two evaluations, a mental retardation specialist re-evaluate the Petitioner. In April 2005, a mental retardation specialist from the Department of Mental Health evaluated the Petitioner and concluded that he was capable of defending himself at trial. On March 20, 2006, the Petitioner pled guilty to second degree murder and received a thirty-year sentence to be served at one hundred percent.
>
> On February 1, 2011, the Petitioner filed a pro se petition for post-conviction relief, raising several issues, including that he was actually innocent of the crime and received the ineffective assistance of trial counsel. The State filed a motion to dismiss the petition on the basis that it was time-barred. The post-conviction court concluded that it should conduct an evidentiary hearing to determine whether due process required tolling the one-year statute of limitations and appointed counsel to represent the Petitioner. Counsel filed an amended petition, arguing that the statute of limitations should be tolled due to the Petitioner's mental incompetence. In support of the amended petition, counsel attached the Petitioner's medical records since the entry of his guilty plea. In October 2011, the post-conviction court ordered that Pathways evaluate the Petitioner to determine whether he was competent to participate in the post-conviction process, and the evaluator concluded that the Petitioner was competent.
>
> In April 2012, the post-conviction court conducted the evidentiary hearing to determine whether the Petitioner's alleged mental incompetence tolled the statute of limitations. At the hearing, Anne McSpadden, a psychologist at West Tennessee State Penitentiary, testified as an expert in psychology that she met with the Petitioner one time in April 2006. The

Petitioner had been referred to her in order for her to determine whether he was eligible to participate in a program for low-functioning inmates and whether he would benefit from "some type of therapy." Dr. McSpadden met with the Petitioner for twenty to thirty minutes and determined that he was not eligible for the program due to the length of his sentence and the severity of his crime. At the time of their meeting, the Petitioner had just entered the Department of Correction and was receiving treatment for major depression. Dr. McSpadden said the Petitioner seemed to have trouble remembering things and "had issues surrounding his case and . . . was confused." She explained that people with major depression typically "experience significant impairment in their day to day ability to work, manage their affairs, and to just deal with the day to day stressors." The Petitioner also had been diagnosed with post-traumatic stress disorder (PTSD), which could cause flashbacks and nightmares, and was taking several antipsychotic and antidepressant medications. He reported to Dr. McSpadden that he had very little education and could not read or write. Dr. McSpadden stated, "I would think that it would be very difficult for anybody in this day and time to not be able to read and write to deal with what we have to do from day to day."

Dr. McSpadden testified that the Petitioner could not remember much about what had happened in the past. She said that in 2004, Pathways had determined that his IQ was 60, which "falls in the mildly mentally retarded branch." She explained that people diagnosed as mildly mentally retarded had impaired judgment in most areas of their lives and usually required supervision and monitoring. If they worked, they usually had to have a job coach help them, and they often lived in supervised care homes or with their families. Dr. McSpadden stated that in her experience, people with an IQ of 60 usually functioned on a reading and writing level of third grade or less and would have to have assistance managing their personal affairs. Dr. McSpadden said that in her opinion, it would be very difficult for the Petitioner to manage his personal affairs or understand legal options available to him. She said that some of her opinions about the Petitioner were based on events that occurred after she interviewed him in April 2006.

On cross-examination, Dr. McSpadden testified that there were "significant differences" in people diagnosed as mildly mentally retarded. With support and help, some of them could maintain a fairly normal life without constant supervision. The State showed Dr. McSpadden a report from an evaluation conducted on the Petitioner by the Department of Mental Retardation Services in April 2005. She acknowledged that the

report indicated the Petitioner could read, check his own blood sugar levels, and perform a difficult task such as changing the clutch in his truck. She also acknowledged that the report indicated the Petitioner worked in a factory for twenty-three years, owned a furniture shop for three years, and worked as a sharecropper for about thirteen years. However, she was not sure the information in the report was accurate. Dr. McSpadden acknowledged that the Petitioner's 2005 evaluation assessed whether he was malingering and that the evaluator concluded the Petitioner was malingering. The Petitioner's April 2005 evaluation was conducted over a two-day period and was more detailed than the twenty- to thirty-minute interview Dr. McSpadden conducted in April 2006. Dr. McSpadden did not diagnose the Petitioner with any conditions as a result of their interview, and she did not see him again.

On redirect examination, Dr. McSpadden testified that in April 2005, the Petitioner's Global Assessment of Function (GAF) test score was 60. She said that GAF measured "how well a person is doing relative to the general population" and that a score of 60 meant "he has impairment. He either has moderate impairment in one area or mild impairment in all three areas of his life. And those areas being work, relationships, and the other use of available time." She acknowledged that according to the Petitioner's November 2004 evaluation, Pathways concluded that he was incompetent to stand trial due to his mental retardation.

The Petitioner testified that people at the prison prepared his paperwork for him, told him how to do his job, and told him when to take a shower. He said inmates "[do] my business" and "[g]et my clothes." Sometime before the Petitioner entered prison, his brother obtained power of attorney over his affairs because he could not make decisions. He said he could sign his name but could not read or write. The State asked if he was able to understand his legal responsibilities and obligations, and the Petitioner answered, "I guess I do. Yeah." He said that he "didn't have nothing to do" with the filing of his pro se petition for post-conviction relief and that he did not understand the information in the petition. He also said that he did not understand that by filing the petition, the post-conviction court could order that his guilty plea be withdrawn and that he go to trial. The guards and nurses assisted the Petitioner in prison. He said that he went to the prison hospital twice per day for blood sugar monitoring, that he ate too much food, that he did not know what foods he could eat, and that "they have to take it away from me."

On cross-examination, the Petitioner acknowledged that he signed his petitions for post-conviction relief but said that he did not know why the petitions were filed. He acknowledged that an individual named Peter Jenkins prepared his pro se petition and said that Jenkins "writes my letters and [tells] me what to do." The Petitioner stated that he signed whatever Jenkins told him to sign and that he did not know anything about the law. He acknowledged that he had a prison job but said, "They pay me, but I don't do nothing. . . . Well, the other guy does the job. He tells me what to do." He acknowledged that he used to work in a factory and said that he worked there more than twenty-three years. He also worked as a sharecropper but never owned a furniture shop. He stated that he "told people stuff to make me look good . . . because [they] was calling me retarded" and that "I ain't normal." He said that when he visited the prison doctor, other inmates told him what to tell the doctor because the inmates did not want him "[put] in the crazy house." The State asked the Petitioner if he had ever resided in a supervised home facility, and he answered, "I don't understand a word you [are] saying."

On redirect examination, the Petitioner testified that he could not learn in school. He said that when he was ten years old, he was told that he was "retarded" and that his going to school was "useless."

Samantha Phillips testified that she was the Health Administrator at Northwest Correctional Complex, where the Petitioner was an inmate. She identified the Petitioner's medical records, and the State introduced the records into evidence. Phillips stated that she was familiar with the policies and procedures for appointing conservators for inmates and that nothing in the records indicated a conservator had been appointed for the Petitioner.

In a written order, the post-conviction court concluded that the Petitioner failed to show by clear and convincing evidence that within one year of his judgment of conviction becoming final, he "lacked the mental capacity to manage his personal affairs and to understand his legal rights." Thus, the post-conviction court concluded that the statute of limitations should not be tolled and dismissed the petition for post-conviction relief as time barred.

*Bobby Glen Crocker*, 2013 WL 2327092, at *1-4 (footnote omitted).

This Court affirmed the dismissal of the petition, concluding that the post-conviction court had not erred in finding that Petitioner had failed to prove by clear and convincing evidence that he suffered from mental incompetence necessitating the tolling

of the statute of limitations. *Id.* at \*5. On October 23, 2013, the Supreme Court of Tennessee granted Petitioner's Rule 11 application for permission to appeal, vacated the decision of this Court, and remanded to the post-conviction court for an additional hearing so that Petitioner was "afforded the opportunity to present additional evidence concerning his alleged incompetency in light of the standard . . . adopted in *Reid* [*ex rel. Martiniano v. State*, 396 S.W.3d 478 (Tenn. 2013)]." *Bobby Glen Crocker v. State*, No. W2012-00960-SC-R11-PC, at 3 (Tenn. Oct. 23, 2013) (Order). *Reid* announced a new standard by which courts should determine whether the post-conviction statute of limitations should be tolled for a petitioner with an alleged mental incompetency. *See id.* at 1-2. That decision was released while Petitioner's post-conviction appeal was pending.

Upon remand, the post-conviction court held another evidentiary hearing on May 6, 2014, during which the following evidence was adduced.

Ms. Fannie T. Shelton testified that she was a nationally certified psychiatric nurse practitioner, family nurse practitioner, and gerontological nurse practitioner. She received her undergraduate education from the University of Tennessee and the University of Memphis. She received a Master's degree in nursing, "specifically in diagnosing and treatment," from the University of Tennessee in December 1981. She practiced at Veterans Medical Center in Memphis from 1981 through 2006.

Ms. Shelton saw Petitioner on June 30, 2006, and in September 2006 at Northwest Correctional while she was employed by Mental Health Management, Inc. Petitioner's diagnosis on both occasions was "major depressive disorder recurrent with psychosis and [post-traumatic stress disorder ("PTSD")]." After evaluating Petitioner, Ms. Shelton "continued [Petitioner] on his current medical regimen . . . because he was doing so well." At the hearing, Ms. Shelton could not recall what medications Petitioner was taking at the time, but she was "sure" that he was "on an anti-depressant for his depressive disorder." Petitioner may have been taking psychotropic medications for the "psychotic features" that sometimes accompany depression.

Each of Petitioner's diagnoses of major depressive disorder and PTSD is a mental disease or defect and an "Axis 1" psychiatric diagnosis. Ms. Shelton explained that, "according to DSM-IV and V [the Diagnostic and Statistical Manual, fourth and fifth editions], there's a spectrum in Axis 1 [that] relates to the psychiatric component of the . . . disorders. There's . . . Axis 2, 3, 4, and 5, but this specifically is related to a psychiatric diagnosis." She testified that an Axis 1 diagnosis would not affect a person being able to understand his or her legal rights and would not "have any effect on their mental capabilities as they process information [or] things of that nature." When Ms. Shelton observed Petitioner in June and September of 2006, "he was having no symptoms, no hallucinations, no problem with sleep or appetite, no side effects from medications, and he did not voice any complaints . . . of his mental status exam, but he was stable at that

time." Ms. Shelton stated that nothing in her observation notes suggested that Petitioner was untruthful or deceptive during their meetings.

Ms. Shelton could not remember the particular meetings that she had with Petitioner; she could only testify based on her notes. Ms. Shelton's notes reflected that there were not any noteworthy differences between Petitioner's condition in June and in September. Ms. Shelton never made any inquiry into Petitioner's educational background or IQ, although Petitioner reported to Ms. Shelton that he was attending "AC" school. Ms. Shelton could not recall what that abbreviation meant. She did not discuss Petitioner's legal situation with him. Ms. Shelton stated that neither of Petitioner's diagnoses would "in any way affect [Petitioner] from being able to make a rational choice between options that are presented to him."

Ms. Shelton explained that patients received an initial treatment plan, which was reviewed every six months by a team to discuss whether any changes needed to be made. Each time Ms. Shelton observed Petitioner, there was a treatment plan in place for him. Petitioner received outpatient treatment for his diagnoses, and Ms. Shelton never felt that his condition was acute enough to necessitate inpatient treatment.

Ms. Shelton's records reflected that Petitioner mental status in June 2006 was "oriented times four," which is the highest level on the assessment form. In this mental status, Petitioner's memory and intellect were intact, and his speech and thought processes were "appropriate." Petitioner had no complaints about his sleep, and he did not have hallucinations or delusions. Petitioner's mood was normal. He had no health changes. Petitioner was compliant with his medications and did not have any side effects. Ms. Shelton's overall assessment was that Petitioner was "stable and maintaining."

Ms. Shelton also completed a form for the Tennessee Department of Correction Abnormal and Voluntary Movement Scale ("AIMS" form). On the AIMS form, a health practitioner will "grade whether there are side effects to the medications that a person is prescribed, and if the[re] are, [one] can adjust or discontinue" medication. The AIMS form for Petitioner indicated that in June and September of 2006 Petitioner did not have any problems with his facial and oral movements, extremity movements, trunk movement, or global judgment and mental status. Nothing in Ms. Shelton's records indicated that Petitioner "could not make rational choices on his own."

Dr. Anne Marie McSpadden, who previously testified at Petitioner's first post-conviction hearing, testified again. She was a psychologist working as the mental health administrator for West Tennessee State Penitentiary ("WTSP"). Dr. McSpadden obtained a PhD in Applied Behavioral Studies from Oklahoma State University in 1985.

Dr. McSpadden could not remember specifically meeting with Petitioner in 2006, but her records reflected that she did. At that time, she was a consulting psychologist for WTSP.

Dr. McSpadden testified that Petitioner's diagnoses of major depressive disorder recurrent with psychosis and PTSD are "a mental disease or defect." She also stated that "a serious mental illness [affects] [a] person's ability to make choices." She testified that Petitioner's diagnoses of major depressive disorder recurrent with psychosis and PTSD "would not make it impossible" for Petitioner "to understand his legal position and any options that are available to him," but they "could certainly influence" his ability to understand them. Dr. McSpadden affirmed that Petitioner's IQ was 66, but stated that Petitioner's IQ combined with his mental disorders would not change her conclusion about his ability to understand his legal options. Dr. McSpadden acknowledged that an inability to read or write might affect Petitioner's ability to understand his legal options simply because he may not be able to read documents or understand difficult words or concepts. Dr. McSpadden testified that Petitioner's mental diagnoses, IQ, and inability to read and write, when combined, would affect Petitioner's ability to make a rational choice when presented with options. She could not attribute the impairment to any particular cause or condition because "that's difficult to parse out."

On cross-examination, Dr. McSpadden agreed that she only saw Petitioner on one occasion. She acknowledged that, despite the combination of conditions and deficiencies afflicting Petitioner, any particular case will vary with a patient's individual symptoms. Dr. McSpadden testified that she was "not able to say specifically that [Petitioner] has been affected by this mental health disorder or disease or this IQ level as far as him making rational choices while he's been at the penitentiary." Dr. McSpadden admitted that, although she said that Petitioner's ailments could have an effect on him, she was "not here saying that it has prevented him from understanding his legal position at any time during the time he's been in prison." She also admitted that she was "not able to testify here today that it [ha]s prevented him from making any rational choices during the time he's been in the penitentiary system."

Pete Clinton Jenkins was an inmate housed with Petitioner at Northwest Correctional Facility in Tiptonville. Mr. Jenkins had been incarcerated there since 2004, before Mr. Crocker arrived. He was with Petitioner on a daily basis and spent "on average, four hours" with Petitioner. Mr. Jenkins "help[ed] him fill out commissary clothing forms, just daily routine things we have to do at the prison." He recalled that, when Petitioner first arrived at the prison in 2006, his mental state was "very bad." Mr. Jenkins explained: "He was a lot disoriented. . . . He'd have to be told what to do, how to do it, where he would go and how he would make his bed. Just various things. Everyday, routine things you'd have . . . to tell him." These "routine things" were those "that a normal person of his age should know how to do" and would not have been learned after entering prison.

Mr. Jenkins affirmed that Petitioner cannot read or write; he has never seen Petitioner write anything other than signing his name. Mr. Jenkins wrote letters for Petitioner to his attorney because Petitioner could not write them on his own. Mr. Jenkins helped Petitioner file his petition for post-conviction relief. He stated that Petitioner "at no time" understood that he had a right to file the petition.

Mr. Jenkins said that he remembered Petitioner being on medication for an extended period of time until 2010 or 2011, "right before [he] filed this petition." After Petitioner stopped taking his medication, Mr. Jenkins "tried to tell him what all [he] felt was done wrong in his case," but Petitioner did not seem to understand. Mr. Jenkins tried to explain these things to Petitioner "back in 2007, 2008," but "he didn't understand." Mr. Jenkins explained:

> He don't know nothing about the law. . . . He thought he was only going to be there for a year, you know, and then I said, "Well, Bobby, you've got longer in here than that." I said, "Didn't they tell you you've got another appeal?" He said, "No." He said, "What is an appeal?" And, I'd have to sit down and explain to him what an appeal was.

Mr. Jenkins stated that Petitioner does "not really" understand the concept of post-conviction relief; "[h]e understands that he's in court, but that's about the extent of it." Mr. Jenkins believed that another inmate also tried to help Petitioner file for post-conviction relief, but Petitioner did not understand.

He stated that in prison, Petitioner had a job "collecting bags, putting them in a blanket and roll[ing] them up. That's about it." Petitioner also had a job "wiping off tables." Mr. Jenkins did not know of any classes taken by Petitioner since he had been in prison.

When Petitioner first arrived at the penitentiary, "he was off on his own" and "didn't have nobody." Petitioner "was scared to death. Would stay in his cell a lot, wouldn't come out. [Mr. Jenkins would] have to get him to come out, walk in the yard." Petitioner had a cellmate. Mr. Jenkins did not know of Petitioner ever being mistreated in prison; "people kind of look out for" him. Mr. Jenkins agreed that some would say Petitioner "acts more like a kid . . . than anything else."

Petitioner did not discuss any legal issues with Mr. Jenkins and was not able to understand any of the legal concepts explained to him by Mr. Jenkins. Mr. Jenkins "somewhat has a grasp on how our system works" because he has "been through habeas corpus relief" and "had suits in federal court and taken numerous avenues since the early '90s to try to get [his] case taken care of." Mr. Jenkins was unaware of any legal

assistance available to prisoners once they arrived at prison, but there was a law library available. He did not think Petitioner could use the library given that Petitioner cannot read, and he has never seen Petitioner in the law library. Mr. Jenkins stated that there was a law clerk at the library that "tries to help with . . . court matters." The law clerk must be sought out for help; he does not approach inmates.

On cross-examination, Mr. Jenkins testified that he had been in prison since 1994 "for two convictions of aggravated rape that are stacked on top of each other for thirty years." He agreed that he thought "the system" had done him wrong. He acknowledged that he has "filed appellant briefs and . . . a writ of habeas corpus and all sorts of things to try to get out of" his convictions. Mr. Jenkins also has felony convictions for theft, burglary, and an escape from prison.

The prosecutor entered into evidence a letter admittedly typed and signed by Mr. Jenkins. The letter is dated November 10, 2011, is addressed to the Clerk of Court, and was file-stamped on November 15, 2011. In the letter, Mr. Jenkins alleges:

> I have known Bobby for several years and in this time, I have talked to him on several occasions and issues. I've also looked over what paperwork he has had as well as listen very closely to his story, recollection of events that transpired.

The letter further provides details of Petitioner's case, dates, and meetings with an attorney about the civil lawsuit filed against Petitioner for the wrongful death of his wife. Mr. Jenkins acknowledged that, in the letter, he claimed that someone else drafted Petitioner's petition for post-conviction relief. However, Mr. Jenkins clarified that, "I rough drafted it, and I let them do it. . . . And I filed it for him."

Petitioner testified that he is currently imprisoned in Tiptonville. He has known Mr. Jenkins ever since he arrived in prison, but he cannot remember when he first arrived. Petitioner claimed that he "was kind of in a nightmare" at first. He explained:

> I had nightmares and people doing stuff to me where I lived, you know. My daddy used me for five years of abuse. I went through hell, and he done it to me. And I was living in hell. I prayed for hell. I tried to kill myself hundreds of times. My brother saved me. He should not never have saved me. My wife teached me how to kill myself.

Petitioner also provided the following in regards to his condition when he first arrived:

> I was too sick. I was too sick when I first went there, but I got better. People was helping me, and the nurse . . . was taking care of me. . . . I

-10-

couldn't remember. And sick and all, you know. I didn't know when to get up or how to do anything in prison or do anything. If people was helping me and the nurses, they helped me a lot. Every time I'd go down there, the nurses would give me candy and stuff and feed me, you know, and talk to me and try to encourage me, you know, to try to hold it together and everything . . . . But the doctors, they worried about me down there, you know. They asked me questions all the time because they don't want me to . . . relapse or something. They said . . . too much pressure on me and cause me to relapse again.

Petitioner admitted that he was taking medication when he arrived at prison. He said, "[T]he medicine helped, but it didn't take away the nightmares that goes since I was hearing things, you know, seeing dead people." Petitioner could not describe how the medicine helped him. He did not remember when he stopped taking medication, but he stated that he is no longer taking any, except for his heart and diabetes.

Regarding his knowledge of the petition for post-conviction relief, Petitioner stated:

[W]hen I went to the penitentiary, I had no knowledge of nothing. I had known nothing about no library, nothing like that. I didn't know they had anything existed you could file a petition. I didn't know. I thought when I went to the pen, that was it. There wasn't nothing nobody could do.

Petitioner claimed that he did not remember helping Mr. Jenkins file the petition or providing him information to prepare it. Petitioner said that he did not "know anything about post-conviction relief" when he first arrived at the penitentiary. He expounded:

I can't read or write. I didn't know it existed. I thought that was it. I mean, they put me in the pen. Somebody did. . . . I thought it was permanent. I didn't know you could come back to court. I had no idea I could come back up here and post-convict. Didn't nobody tell me. If they told me, I would of had.

Petitioner testified that he thought he would only "be at the penitentiary" for one year because that was what his lawyer told him. Petitioner could remember "some of the things" that his attorney did, but he was not taking medication at the time. Petitioner denied ever going to the law library or talking with the law clerk about his case.

Petitioner explained that other inmates beside Mr. Jenkins had "helped" him in prison:

-11-

They helped me.  When I go to the psychologist, they tell me what to say, you know, and not to play crazy, that they'll put me in a mental hospital, stuff like that.  They take care of me, and I don't say nothing to the doctors that's going to throw them off, you know.

On cross-examination, Petitioner admitted that he was "clever" about knowing how to talk to doctors so that he could avoid going to the mental hospital.

Petitioner said that he is "on the last job [he] can do now because [he] couldn't do the others."  He has been removed from other jobs for "messing" them up.  According to Petitioner, the other "inmates get tired of showing [him] all the time."

Petitioner denied knowing why he was at the hearing, but he said that Mr. Jenkins talked to him about it.  Petitioner testified that, at the time of the hearing, he understood that he had a right to file a petition for post-conviction relief, but he could not remember at what point he realized that.  Petitioner said that he did not know that he could file a petition for post-conviction relief before this one was filed.  Petitioner did not know that he "had a right to appeal [his] case when he got convicted."  He added, "I thought I was supposed to stay in prison. I mean, I signed that deal, ever what it was they told me to sign.  I do what they told me to do."  Petitioner told the post-conviction court that he would "like to have another trial" and to be given "another chance."

Petitioner could not remember being in court for his guilty plea and did not remember being told that he would serve a thirty-year sentence as a "100% offender." Petitioner said "I would had no idea what a 100 percent is nothing.  Nobody explained it. . . . You might as well been talking to a tree.  I wouldn't understand it."  When asked if Petitioner understood that he would have to serve 85% of his sentence, Petitioner claimed, "I don't remember that, and I wouldn't have knowed what it meant even if I'd said because I can't count.  I ain't got no education.  I wouldn't know what it meant."

Petitioner denied wanting a new trial initially but admitted that he "signed the [post-conviction] papers" because he "agreed with it."

[Prosecutor]:  So when you found out that you can sign some papers and come back and see the judge, you wanted to do that, didn't you?

[Petitioner]:  Yes, sir.  I did.

[Prosecutor]:  That was your decision, wasn't it?

[Petitioner]:  Yeah.

[Prosecutor]: And the only thing that prevented you from doing that before any of this is because nobody come and told you that?

[Petitioner]: Didn't nobody tell me.

At the end of the hearing, the post-conviction court again found that due process did not require tolling of the post-conviction statute of limitations because Petitioner had failed to prove by clear and convincing evidence that he was mentally incompetent.

*Analysis*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A petition for post-conviction relief must be filed within one year of the date on which the judgment became final if no direct appeal was taken. T.C.A. § 40-30-102(a). Our legislature emphasized the fact that "[t]ime is of the essence of the right to file a petition for post-conviction relief," *id.*, and provided only three narrow exceptions to the statute of limitations: (1) a new constitutional right with retrospective application; (2) new scientific evidence establishing actual innocence; and (3) the invalidation of convictions underlying an enhanced sentence. T.C.A. § 40-30-102(b).

However, the right to due process may necessitate tolling the statute of limitations in certain circumstances outside of the enumerated statutory exceptions. *See Seals v. State*, 23 S.W.3d 272 (Tenn. 2000); *Burford v. State*, 845 S.W.2d 204 (Tenn. 1992). Our supreme court has held:

> [B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that a potential litigant be provided an opportunity for "presentation of claims at a meaningful time and in a meaningful manner." The test is "whether the time period provides an applicant a reasonable opportunity to have the claimed issue heard and determined."

*Seals*, 23 S.W.3d at 277-78 (quoting *Burford*, 845 S.W.2d at 207).

Our supreme court has previously held that one circumstance in which due process requires tolling of the post-conviction statute of limitations is where a petitioner's mental incompetence prevents him from complying with the statute's deadline. *Seals*, 23 S.W.3d at 279. A petitioner who is mentally incompetent throughout the limitations period would be legally incapable of asserting his or her constitutional rights in a timely post-conviction petition, and would, therefore, be denied the opportunity to challenge his

-13-

or her conviction in a meaningful manner. *Id.* at 278. Accordingly, "the failure to toll the limitations period would deny such a petitioner a fair and reasonable opportunity for the bringing of the [post-conviction] petition, and thus, would violate due process." *Id.* (quoting *Watkins v. State*, 903 S.W.2d 302, 307 (Tenn. 1995)) (alteration in *Seals*).

Until recently, a petitioner seeking to toll the statute of limitations for mental incompetence had to show that he or she was "unable either to manage his or her own personal affairs or to understand his or her legal rights and liabilities." *State v. Nix*, 40 S.W.3d 459, 461 (Tenn. 2001). However, the Tennessee Supreme Court decided that, "[i]n the interest of uniformity and simplicity, we have determined that the standards and procedures in [Tennessee Supreme Court Rule] 28, § 11 should henceforth be used in all post-conviction proceedings . . . in which the issue of the petitioner's competency is properly raised," including "when a petitioner seeks to toll the statute of limitations in [Tennessee Code Annotated section] 40-30-102(a) due to incompetency." *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 512 (Tenn. 2013). That standard of competency is:

> whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity.

Tenn. Sup. Ct. R. 28, § 11(B)(1). "The question is not whether the [petitioner] is able to care for himself or herself, but whether the prisoner is able to make rational decisions concerning the management of his or her post-conviction appeals." *Reid*, 396 S.W.3d at 513.

At the hearing, the burden is on the petitioner to prove "that he or she is mentally incompetent by clear and convincing evidence." *Id.* at 494 (citing T.C.A. § 40-30-110(f)). Our supreme court has directed lower courts to apply the following three-step test for determining competency:

> (1) Is the person suffering from a mental disease or defect?

> (2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

> (3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

If the answer to the first question is no, the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.

*Id.* at 513 (quoting *Rumbaugh v. Procunier*, 753 F.2d 395, 398-99 (5th Cir. 1985)). The focus of the inquiry is on rational decision making:

A decision may be rational even when it is not one that the majority would consider acceptable, sensible, or reasonable. A decision is rational when it is based on a process of reasoning. A person's decision-making process is rational when that person can (1) take in and understand information; (2) process the information in accordance with his or her personal values and goals; (3) make a decision based on the information; and (4) communicate the decision.

*Id.* at 513 (internal citations omitted).

"Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." *Smith v. State*, 357 S.W.3d 322, 355 (Tenn. 2011) (quoting *Harris v. State*, 301 S.W.3d 141, 145 (Tenn. 2010)). However, we "are bound by the post-conviction court's underlying findings of fact unless the evidence preponderates against them," and we "must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (citations omitted).

Petitioner argues that the post-conviction court erred in finding that Petitioner had not proven mental incompetence entitling him to tolling of the statute of limitations. At the end of the hearing, the post-conviction court made oral findings of fact and conclusions of law. The court indicated that it had reviewed the evidence presented at the first evidentiary hearing in April 2012. After summarizing the testimonies of Ms. Shelton and Dr. McSpadden presented at the second hearing, the court noted that Mr. Jenkins's criminal history "affects his credibility in the [c]ourt's eyes." Regarding the November 10, 2011 letter sent to the Clerk of Court by Mr. Jenkins, the court made "the factual finding that it's most likely that Mr. Jenkins has included some information here that was not related by the [P]etitioner, and it's also probable that the [P]etitioner related

information to Mr. Jenkins beyond what he's indicating that he has the ability to know or recall or understand at this time." As for Petitioner, the court stated:

> [W]hile [Petitioner] says he doesn't know why he's here today, the Court finds that he actually does know. He may not understand the very detailed part of why he's here, but bottom line, he understands that he's here to ask the Court to set aside his conviction and grant him a trial in this case.

The post-conviction court stated the standard established in *Reid* and the three-step test set forth therein and applied it to the facts of Petitioner's case. First, the court found that Petitioner, "during the relevant time period, that is, one year after the finality of the judgment in this case, did suffer from some mental disease or defect. The proof plainly establishes that to be the case." Second, the court found that "the [P]etitioner has not established by the proof in its totality[,] taking the 2012 evidentiary hearing and today's evidentiary hearing into account," that his mental diseases or defects prevented him from understanding his legal position and the options available to him during the "relevant time period of one year or so after the finality of the judgment." Third, the court found that "the condition that [Petitioner] suffers from did not at any relevant time rise to the level of preventing him from making a rational choice about options which were available to him, keeping in mind that the option that we're talking about here is only his ability to file a post-conviction relief petition." The court concluded that "the proof falls short of having established that the statute of limitations provision should be waived by any due process consideration."

The post-conviction court applied the correct legal standard and the evidence in the record does not preponderate against the court's findings of fact. The testimony of Nurse Practitioner Shelton plainly weighed heavily against Petitioner on the second and third prongs of the *Rumbaugh* test, as she denied that his mental diagnoses had any adverse impact on his ability to understand his legal options or make rational choices. In both of her encounters with Petitioner during his first year of imprisonment, he appeared to be functioning quite well on medication. Dr. McSpadden's testimony did not rule out Petitioner's ability to understand his legal options and to make rational choices but simply suggested that Petitioner's combination of disabilities had the potential to make it more difficult for him to comprehend complex concepts and details. The bulk of her testimony consisted of generalizations about individuals with the same mental disorders as Petitioner and lacked specificity as to Petitioner's ability to understand his options or make rational decisions at the time she observed him. Most of her testimony about Petitioner consisted of recounting the information that he had provided to her in their brief one-time meeting. As for Mr. Jenkins, who offered the most specific testimony as to Petitioner's capabilities when he first arrived in prison, the court made an adverse finding as to his credibility and pointed out that much of his testimony was inconsistent with the contents of the detailed November 15, 2011 letter that he had previously filed

with the court, which exhibited extensive knowledge about the intricacies of Petitioner's case.  Finally, the majority of Petitioner's testimony at both hearings was self-serving at best, and Petitioner conveniently could not recall much of anything that may have been to his detriment.  Worth mention is the fact that Petitioner appeared particularly capable of articulating how difficult it was for him to understand anything.  Moreover, there was evidence that Petitioner may have been prone to malinger.  Given all of the evidence in the record, we find no error in the decision of the post-conviction court.

*Conclusion*

For the foregoing reasons, the decision of the post-conviction court is affirmed.


_____
TIMOTHY L. EASTER, JUDGE